**UNITED STATES of America,**

v.

**Jacinto ALVAREZ, Defendant.**

**No. 96–75–CR.**

United States District Court,
S.D. Florida.

Aug. 17, 1999.

Russell Killinger, Assistant United States Attorney, Miami, FL, for Plaintiff.

Emmanuel Perez, Coral Gables, FL, for Defendant.

## MEMORANDUM OPINION AND ORDER

HIGHSMITH, District Judge.

THIS CAUSE came before the Court upon Defendant Jacinto Alvarez's motion to dismiss, filed on March 25, 1999. The Court held an evidentiary hearing spanning two days, July 26 and 27, 1999. Having considered the evidence, having assessed the credibility of the witnesses, having reviewed all pertinent portions of this extensive record, and having heard the argument of counsel, the Court denies the defendant's motion, except as to two counts of the indictment. Moreover, because the evidence presented at the hearing on the motion to dismiss pertained, in large part, to the issues raised in the defendant's two pending motions to vacate pursuant to 28 U.S.C. § 2255, the Court addresses those motions in this memorandum opinion and denies them.[1]

## PROCEDURAL BACKGROUND

On January 24, 1996, the grand jury returned a nine-count indictment charging Defendant Jacinto Alvarez and four others with various offenses stemming from drug "ripoffs". Specifically, Alvarez was

---

1. The Section 2255 motions have been filed as Sealed Cases No. 98–41–CIV–HIGHSMITH and 98–42–CIV–HIGHSMITH. Having decided to address the motions directly, the undersigned hereby vacates the Order dated January 12, 1998, referring Cases No. 98–41 and 98–42 to Magistrate Judge Robert L. Dubé.

charged with the commission of the following crimes:

Count I: Conspiracy to possess cocaine with intent to distribute it during the period from December, 1993, to October 5, 1994, in violation of Title 21, United States Code, Section 846.

Count VII: Possession of cocaine with intent to distribute it on October 5, 1994, in violation of Title 21, United States Code, Section 841(a)(1).

Count VIII: Obstruction of commerce by robbery on October 5, 1994, in violation of the Hobbs Act, Title 18, United States Code, Section 1951(a).

Count IX: Using and carrying a firearm during and in relation to the commission of a crime of violence and a drug trafficking crime on October 5, 1994, in violation of Title 18, United States Code, Section 924(c).[2]

On March 8, 1996, Alvarez entered into a plea agreement with the government, whereby he consented to plead guilty to Count I of the indictment. Alvarez also agreed to plead guilty to an information charging him with income tax evasion for the taxable year 1994, in violation of Title 26, United States Code, Section 7201.[3] Alvarez also pledged to cooperate with the government by: providing truthful information and testimony when called upon by the Office of the United States Attorney for the Southern District of Florida; by appearing at such grand jury proceedings, hearings, trials and other judicial proceedings as required by the Office of the United States Attorney for the Southern District of Florida; and by fully cooperating in the recovery of certain assets, which were forfeitable pursuant to Title 21, United States Code, Sections 853 and 881. With regard to the latter, Alvarez committed his full and unreserved cooperation, including ensuring that the assets were not "sold, disbursed, hidden or otherwise made unavailable." Finally, Alvarez consented to be polygraphed on the issue of assets or any other issue regarding his cooperation, if such a procedure were deemed necessary by the government.

In turn, the government agreed to dismiss Counts VII, VIII and IX of the indictment, after sentencing. The government also agreed, but was not required, to file a motion pursuant to Section 5K1.1 of the Sentencing Guidelines or to Rule 35 of the Federal Rules of Criminal Procedure, reflecting that Alvarez provided substantial assistance. The government would file such a motion only if, after evaluation of Alvarez's cooperation, the government determined that said cooperation was sufficiently significant to warrant a departure from the sentencing guidelines. Finally, the government stated that it would not charge Alvarez with "committing any other federal criminal offenses known to the United States Attorney's Office at time of the execution of this agreement, arising out of the defendant's association with Jaime Cruz, Carlos Gustavo De La Teja and others, not including the crime of murder."[4]

The Court accepted Alvarez's plea of guilty as to Count I of the indictment on March 8, 1996. Thereafter, on July 29, 1996, the Court accepted Alvarez's plea of guilty as to the information filed in Case No. 96–610–CR–HIGHSMITH.

On January 3, 1997, Alvarez came before the Court for sentencing as to both of-

---

**2.** The October 5, 1994 incident pertained to a drug ripoff perpetrated upon a man by the name of Jose Correa.

**3.** The information on the tax evasion charge was subsequently filed as Case No. 96–610–CR–HIGHSMITH.

**4.** Jaime Cruz and Gustavo De La Teja are two of Alvarez's four co-defendants in the original indictment in this action. As noted later in this opinion, the government has since superseded that original indictment four times, adding numerous other defendants and expanding the scope of the case to include the staging of quite a number of assaults, kidnapings and home invasions for the purpose of taking drugs and drug money from the victims. The government has dubbed this investigation and prosecution as "Operation Pumpkinhead".

fenses. In a sentencing position brief, the government indicated that it had developed evidence which contradicted, in several material respects, Alvarez's testimony before the grand jury who returned the first superseding indictment in this case on May 28, 1996. Specifically, the government stated that Alvarez had implicated an individual named Gustavo Venta in a home invasion robbery which occurred at a time when, according to documents obtained by the government, Venta was incarcerated in Cuba. In addition, the government stated that Alvarez had been identified by other cooperating defendants as having been present during a separate robbery in which he had denied participation. Moreover, according to the government, Alvarez had failed to implicate two other individuals, Felix and Lazaro Gallego, in that same robbery, even though other cooperating witnesses had done so. In light of these discrepancies, the government required Alvarez to submit to a polygraph exam as to the robbery in which he denied participation and failed to implicate the Gallegos. The polygrapher reported that Alvarez had been deceptive in answering those questions. Based on these developments, the government did not file a motion for downward departure at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines.

The government, however, did not oppose Alvarez's motion for downward departure pursuant to Section 5K2.0 of the Sentencing Guidelines, based on his assistance to corrections officers during two separate incidents at the Metro–Dade Correctional Facility. The Court granted that motion, which resulted in a reduction of thirty-six months from the guideline range as to Count I. Thus, Alvarez was sentenced to a term of imprisonment consisting of 132 months as to Count I and 60 months as to the charge in Case No. 96–610–CR, both terms to be served concurrently.

Thereafter, the government did not file a motion for reduction of sentence pursuant to Fed.R.Crim.P. 35.[5] Indeed, on October 16, 1998, the grand jury returned a third superseding indictment, in which Jacinto Alvarez was charged with various offenses.[6] The most recent, and fourth, superseding indictment, which was returned on April 2, 1999 charges Alvarez with the following crimes:

Count One: Conspiracy to possess cocaine and marihuana with intent to distribute them during the period from May 7, 1988 to October 16, 1998, in violation of Title 21, United States Code, Section 846.[7]

Count Two: Conspiracy to obstruct commerce by robbery and extortion during the period from May 7, 1988 to October 16, 1998, in violation of the Hobbs Act, Title 18, United States Code, Section 1951(a).

---

**5.** The government has made it clear that it does not intend to file such a motion.

**6.** A second superseding indictment was returned on October 9, 1996. Six of the named defendants, Evelio Rizo, Sr., Abel Rizo, Lenardo Cuellar, Lazaro Gallego, Felix Gallego and Jerry Crespo, were tried and found guilty during a prolonged trial, over which the undersigned District Judge presided, in the Spring of 1997.

**7.** Count One charges Alvarez with participating in a drug conspiracy that is broader in scope than the conspiracy charged in Count I of the original indictment, to which Alvarez pled guilty. The conspiracy charged in the original indictment involved cocaine only; the scheme charged in the fourth superseding indictment involves both cocaine and marihuana. The time frame of the originally charged conspiracy encompassed December, 1993 to October 4, 1994; the scheme charged in the fourth superseding indictment extends from May 7, 1988 to October 16, 1998. In its memorandum in opposition to the motion to dismiss, the government claims that Alvarez's participation in the larger conspiracy extended from October, 1993 to a time period beyond his January 1996 arrest and his March 1996 guilty plea to the conspiracy count in the original indictment. According to the government, Alvarez's post-arrest participation consisted of lying to law enforcement agents to protect other members of the conspiracy who had not yet been indicted. Obviously, these assertions must be proved at trial.

Count Nine: Obstruction of commerce by robbery on October 22, 1993, in violation of the Hobbs Act, Title 18, United States Code, Section 1951(a).

Count Ten: Possession of cocaine with intent to distribute it on October 22, 1993, in violation of Title 21, United States Code, Section 841(a)(1).

Count Eleven: Using and carrying a firearm during and in relation to the commission of a crime of violence and a drug trafficking crime on October 22, 1993, in violation of Title 18, United States Code, Section 924(c).

Count Fifteen: Possession of cocaine with intent to distribute it on October 5, 1994, in violation of Title 21, United States Code, Section 841(a)(1).

Count Sixteen: Obstruction of commerce by robbery on October 5, 1994, in violation of the Hobbs Act, Title 18, United States Code, Section 1951(a).[8]

Count Seventeen: Obstruction of commerce by robbery on November 9, 1994, in violation of the Hobbs Act, Title 18, United States Code, Section 1951(a).

Count Eighteen: Attempted obstruction of commerce by robbery on November 25, 1994, in violation of the Hobbs Act, Title 18, United States Code, Section 1951(a).

Count Nineteen: Using and carrying a firearm during and in relation to the commission of a crime of violence on November 25, 1994, in violation of Title 18, United States Code, Section 924(c).

Count Twenty-four: Attempted possession of cocaine with intent to distribute it on January 19, 1995, in violation of Title 21, United States Code, Section 846.

Count Twenty-five: Attempted obstruction of commerce by robbery on January 19, 1995, in violation of the Hobbs Act, Title 18, United States Code, Section 1951(a).

Count Twenty-six: Using and carrying a firearm during and in relation to the commission of a crime of violence and a drug trafficking crime on January 19, 1995, in violation of Title 18, United States Code, Section 924(c).

Count Twenty-eight: Possession of cocaine with intent to distribute it on April 21, 1995, in violation of Title 21, United States Code, Section 841(a)(1).

Count Twenty-nine: Possession of cocaine with intent to distribute it in the end of December, 1995, in violation of Title 21, United States Code, Section 841(a)(1).

Count Thirty: Possession of cocaine with intent to distribute it in the beginning of January, 1996, in violation of Title 21, United States Code, Section 841(a)(1).

Count Thirty-one: Possession of cocaine with intent to distribute it in the middle of January, 1996, in violation of Title 21, United States Code, Section 841(a)(1).

Count Thirty-six: Possession of a firearm by a convicted felon on January 27, 1996, in violation of Title 18, United States Code, Section 922(g)(1).

Count Forty-one: Perjury before a federal grand jury on April 17, 1996, in violation of Title 18, United States Code, Section 1623.

Count Forty-two: Perjury before a federal grand jury on April 17, 1996, in violation of Title 18, United States Code, Section 1623.

On May 25, 1999, Alvarez filed his motion dismiss. In the opening statement of the motion, Alvarez states that he seeks dismissal of Counts 1–2, 15–17 and 24–26 of the fourth superseding indictment. As grounds for dismissal of these counts, Alvarez points to the provision in the plea agreement whereby the government agreed not to charge Alvarez with committing any other federal criminal offenses,

8. Counts Fifteen and Sixteen pertain to the same incident; i.e., a drug ripoff perpetrated upon Jose Correa, and charge Alvarez with the same offenses, as Counts VII and VIII of the original indictment, which were dismissed by the government after Alvarez was sentenced as to Count I and the tax evasion offense.

that were then known to the United States Attorney's Office, arising from Alvarez's association with "Jaime Cruz, Gustavo De La Teja and others", except for the crime of murder. In addition, Alvarez argues that Count One of the fourth superseding indictment, charging an expanded drug conspiracy, violates the double jeopardy clause, because Alvarez has already pled guilty to the drug conspiracy charge in the original indictment.[9]

In the body of his motion, Alvarez also seeks dismissal of the entire indictment, arguing that the government should not be permitted to re-indict Alvarez on grounds of waiver, fundamental fairness, and detrimental reliance. Moreover, as previously noted, Alvarez has filed two motions pursuant to 28 U.S.C. § 2255. Those motions are unusual in that Alvarez does not seek to vacate his conviction and sentence. Rather, he seeks an order compelling the government to: (1) evaluate the cooperation that he claims to have provided and: (2) file a motion for reduction of sentence, pursuant to Fed.R.Crim.P. 35.

Most, if not all, of the evidence presented by Alvarez at the hearing on the motion to dismiss went to the issue of his claimed cooperation and the government's refusal to file a Rule 35 motion. At the conclusion of the hearing, the Court asked Alvarez's counsel, Emmanuel Perez, to clarify the relief sought in his motion to dismiss, particularly in light of the evidence that had been presented at the hearing. Perez responded that his client is seeking dismissal of all counts in the indictment or, in the alternative, dismissal of the counts enumerated in the motion. Perez further indicated that, in the pending motions pursuant to Section 2255, his client seeks, as additional relief, an order compelling specific performance of the plea agreement by the government. Specifically, Alvarez prays for an order requiring the government to file a motion for reduction of sentence pursuant to Fed.R.Crim.P. 35, for the substantial assistance that Alvarez claims to have rendered.[10]

## FACTUAL FINDINGS

At the evidentiary hearing, the Court first heard the testimony of defendant's father, Benito Alvarez. The senior Alvarez testified regarding assistance he claims to have rendered to various governmental authorities in an attempt to bolster his son's credits towards a Rule 35 motion. The Court found Benito Alvarez's testimony to be rambling, confused and, often, contradictory. Moreover, the witness does not appear to have been totally candid in his testimony with respect to his own prior criminal record. Thus, the Court rejects Benito Alvarez's testimony as wholly lacking in credibility and assigns no probative value to it whatsoever.

The Court also heard the testimony of Captain (formerly Sergeant) Joe Villaronga, of the Homestead Police Department. Captain Villaronga recounted the cooperation he received from Defendant Jacinto Alvarez and his father Benito Alvarez in the investigation of a drug case in mid–1997. Captain Villaronga also stated that he had brought this information to the attention of Assistant United States Attorney Russell Killinger, the prosecutor in this action. The Court accepts Captain Villaronga's testimony as truthful.

Two witnesses from Nashville, Tennessee testified regarding information and assistance they received from both the defendant and his father in the investigation of a drug conspiracy, which was related to Captain Villaronga's probe and extended

---

9. Alvarez does not argue that Counts Fifteen and Sixteen should be dismissed on double jeopardy grounds. However, logic dictates addressing this issue.

10. The Court notes that the motions pursuant to Section 2255 were not filed by Mr. Perez, who has been appointed under the Criminal Justice Act to represent Alvarez in connection with the charges contained in the fourth superseding indictment. The Section 2255 motions were filed by retained counsel, Mary Catherine Bonner, in January, 1998. As discussed below, Bonner testified at the hearing on the motion to dismiss.

into their area. The Court accepts the testimony of these two witnesses, Agent Benny Goodman of the Drug Enforcement Administration and Assistant United States Attorney Sunny Koshey, as truthful. The Court notes, however, that the motivation of these witnesses, as well as that of Captain Villaronga, while well-intentioned, does not appear totally objective. They received cooperation from Alvarez and his father which they obviously deem to have been valuable to their investigative and prosecutorial efforts, but which they are powerless to compensate.[11] Thus, in a very human way, each of them tried his best from the witness stand to give credit to Alvarez and his father for their assistance.

Next, the Court heard from Jay Levine, who represented Alvarez in connection with the charges contained in the original indictment through the sentencing phase. In January, 1997, Levine engaged in a series of conversations and correspondence with Assistant United States Attorney Russell Killinger regarding the prospects for the filing of a Rule 35 motion. In a letter dated January 16, 1997, Killinger states that the government's position is that Alvarez did not keep his promise under the plea agreement; hence, the government would make no further promises. According to Killinger, "Any information or assistance provided to law enforcement will of course be considered but there can be no assurances that such will result in the filing of a Rule 35 motion." On that same day, Levine sent a written inquiry as to the meaning of this language. Thereafter, on January 22, 1997, Levine wrote again, summarizing a telephone conversation as having reached the understanding that Killinger would consider filing a Rule 35 motion and would take into account

cooperation by both Alvarez and his father. Killinger responded to this letter on January 27, 1997, stating that, upon further reflection, he would not file a Rule 35 motion on behalf of Jacinto Alvarez "based upon 'second party' cooperation"; i.e., cooperation from Benito Alvarez.

In April, 1997, after a particularly violent home invasion robbery took place in the area of Sweetwater in West Dade County, Levine again communicated with Killinger, pleading for him to accept information, which Alvarez and his father claimed to have in connection with that incident.[12] As a result, Killinger wrote to Levine on April 25, 1997, stating that he would consider that specific information for purposes of deciding, within his office's sole discretion, the potential of filing a Rule 35 motion. Finally, on August 12, 1997, Killinger wrote to Levine again, after receiving the report from Captain (then Sergeant) Villaronga regarding the cooperation rendered by Alvarez to the Homestead Police Department. In that letter, Killinger assessed Alvarez's status as follows. According to Killinger, his office had received information regarding criminal activities in which Alvarez allegedly participated but failed to disclose pursuant to the terms of the plea agreement. Killinger also noted that Alvarez had not fully complied with the plea agreement in terms of identifying and disclosing all assets that were subject to forfeiture. Killinger went on to outline certain steps that Alvarez must take in order to make amends and receive favorable consideration from the government: (1) to submit a detailed proffer of all previously undisclosed criminal acts in which he had participated, including the names of every other participant; and (2) to identify and produce for forfei-

11. None of these three witnesses claimed to have accepted cooperation from Alvarez and his father with any assurances from United States Attorney Russell Killinger that Alvarez would receive credit for it by way of a Rule 35 motion. Indeed, Assistant United States Attorney Koshey acknowledged being told by Killinger that Alvarez had serious credibility problems.

12. According to Levine's recollection, a little girl was raped during the robbery. The Court does not necessarily accept the truth of this statement; rather, the Court considers it merely to assess its impact upon Levine and Killinger's interaction.

ture all property and proceeds not yet revealed to the government. Killinger closed by stating, "Only upon satisfying the above two (2) criteria will this office deal with Mr. Alvarez in any posture other than a target of further prosecution." Thereafter, Levine had no further communications with Killinger. According to Levine, his post-sentencing efforts were directed both at assisting his client and, in the case of the Sweetwater home invasion, to prevent or deter such particularly heinous acts of violence. The Court found Levine's testimony to be truthful and candid.

Mary Catherine Bonner was retained by Alvarez to pursue with the government the filing of a Rule 35 motion. She testified at the hearing that she visited Alvarez at the federal prison in Talladega, Alabama in September, 1997 to follow up on the "getting back on the bus" letter from Killinger. Bonner was referring to the requirements outlined in Killinger's August 12, 1997, letter to Levine which Alvarez must fulfill in order to make amends and receive favorable consideration from the government. On September 22, 1997, after interviewing Alvarez, Bonner wrote a proffer letter to Killinger. In that letter, Bonner disclosed various incidents and the individuals involved, and also provided information regarding assets. In a follow-up letter, dated December 11, 1997, Bonner requested a meeting with Killinger to pursue cooperation. In her second letter, Bonner stated that she felt there were grounds for seeking relief pursuant to 28 U.S.C. § 2255, but that her real goal was to "rebuild the bridge to the government". Having received no response, on January 7, 1998, Bonner filed the two pending motions pursuant to Section 2255. Bonner's testimony was credible.[13]

Finally, the Court heard the testimony of Assistant United States Attorney Russell Killinger. Preliminarily, the Court notes that, throughout numerous court appearances in connection with this rather complex and prolonged case, Killinger has exhibited an appropriate balance between zealous prosecution and candor with the Court. His testimony at this evidentiary hearing also reflected this quality. Killinger recounted his dealings with Alvarez from the time of Alvarez's arrest on January 27, 1996. In the plea negotiations, Killinger rebuffed Levine's attempts to obtain a blanket grant of immunity, agreeing only to a limited immunity; i.e., no charges for crimes as to which the government had knowledge at the time of the agreement arising out of Alvarez's association with Jaime Cruz, Carlos Gustavo De La Teja and others, excluding the crime of murder. Killinger explained the process whereby he discovered discrepancies between Alvarez's testimony before the grand jury and evidence obtained from other defendants. According to Killinger, once Alvarez failed the polygraph administered by the government on November 20, 1996, no more debriefings were conducted by law enforcement personnel for the Southern District of Florida. Killinger also recounted the problems that arose as a result of Alvarez's testimony before the grand jury, which necessitated another superseding indictment, wherein charges against Gustavo Venta were eliminated, and charges against the Gallegos were added.

Killinger also explained his dealings with Jay Levine after Alvarez's sentencing, particularly Levine's attempts to revive his client's cooperation status. In explaining his decision to accept information from Alvarez and his father as to the Sweetwater home invasion, Killinger admitted to his own concerns that, in maintaining an adamant position vis-a-vis Alvarez, he might be hindering a larger prosecutorial and societal goal.

In Killinger's estimation, however, even when given a second chance to redeem

---

13. Bonner's letters also allude to Alvarez's newly acquired understanding of the concept of "conflict of interest" and "potential of divided loyalties of counsel", as well as Alvarez's concerns regarding his own and his family's safety. Bonner, however, provides no specific factual support for these assertions.

himself, via the August 12, 1997 letter to Levine, Alvarez did not come forth with complete and truthful information. Killinger considers the September 22, 1997 proffer letter authored by Mary Catherine Bonner to have fallen short of the mark.[14] In support of this assessment, Killinger cited to the case of Luis Acosta, a co-defendant in the fourth superseding indictment about whom Jacinto provided no information in the proffer letter, yet whose activities Killinger believes Alvarez had to know, since Acosta had been previously arrested with Benito Alvarez. Killinger also expressed misgivings about Alvarez's truthfulness regarding the disclosure of forfeitable assets.

The Court finds that Killinger's concerns regarding the sincerity of Alvarez's cooperation are justified, based on past events. The Court further finds that Killinger has proceeded in this matter in good faith, specially with regard to his willingness to give Alvarez a final opportunity to "come clean". In this regard, the Court rejects Alvarez's proposed interpretation of Killinger's conduct as misleading to the defendant or as a "baiting" strategy.

Having considered all of the foregoing testimonial evidence, as well as the documentary evidence and the record, the Court finds that, by providing incomplete and untruthful information, Alvarez breached the plea agreement of March 8, 1996. The Court also accepts and adopts Killinger's assessment that Alvarez did not cure the breach, even after having been provided an opportunity to do so. Finally, the Court finds that Alvarez's breach of the plea agreement releases the government from performing the executory promises under the agreement; specifically, the discretionary filing of a Rule 35 motion, and the limited grant of immunity.

### DISCUSSION

As previously noted, Alvarez seeks several forms of relief. The Court discusses each in turn.

---

**14.** The letter constitutes an admission on the part of Alvarez that he had failed to provide

### 1. The motion to dismiss the entire indictment:

■ In support of this request, Alvarez argues that the government should not be permitted to re-indict Alvarez on grounds of waiver, fundamental fairness, and detrimental reliance. According to Alvarez, the government encouraged his continued cooperation, and that of his father, even in disregard of the potential for the latter's physical danger. Alvarez also argues that his cooperation, and that of his father, were the result of his detrimental reliance upon the governments apparent intent to "forgive and forget". Finally, Alvarez claims that fundamental fairness prevents the government from benefitting from his cooperation and prosecuting him at the same time. The facts adduced at the hearing do not support any of these contentions. Rather, the facts support the conclusion that Alvarez proffered cooperation to such agencies, and in such measure, as he saw fit. This arbitrary conduct on the part of the defendant did not trigger any duty on the part of the government to refrain from further prosecution. Were the Court to reach such a conclusion, it would be engrafting upon the plea agreement a blanket grant of immunity, one that Killinger specifically declined to include in the bargain. Hence the Court denies Alvarez's global argument for dismissal of the entire indictment.

### 2. The motion to dismiss the counts 1–2, 15–17 and 24–26:

■ In support of this aspect of his motion, Alvarez argues that the incidents underlying the crimes charged in Counts One, Two, Fifteen, Sixteen, Seventeen, Twenty-four, Twenty-five and Twenty-six were known to the government at the time of the plea agreement. Counts Fifteen and Sixteen charge the same crimes that were charged in Counts VII and VIII of the original indictment, the counts that were dismissed by the government at Al-

complete and truthful information to the government, as required by the plea agreement.

varez's sentencing. Count One is a broader version of the drug conspiracy to which Alvarez pleaded guilty. Therefore, it is undisputed that the government knew about these crimes at the time of the plea agreement. Alvarez contends that the government also had knowledge at the time of the plea agreement regarding the crimes charged in Counts Two, Seventeen, Twenty-four, Twenty-five and Twenty-six. In support of this contention, Alvarez's counsel attempted to elicit from Killinger, on cross-examination, the prosecutor's interpretation of the partial immunity language contained in the agreement. The Court need not consider this parol evidence, nor ascertain the scope of the contractual language to determine whether the government had the requisite knowledge. Because Alvarez breached the plea agreement, the government is excused from further performance under the agreement, including adherence to the partial grant of immunity. Therefore, the Court denies Alvarez's motion to dismiss Counts One, Two, Fifteen, Sixteen, Seventeen, Twenty-four, Twenty-five and Twenty-six pursuant to the terms of the plea agreement.

### 3. Double jeopardy as to Count One:

■ In its response to Alvarez's motion, the government acknowledges that Count One of the superseding indictment charges a crime for which Alvarez was previously placed in jeopardy, to wit, a drug conspiracy. The government argues, however, that re-indictment is permitted by the "due diligence" exception to the double jeopardy clause.[15] In *United States v. Tol-*

liver, 61 F.3d 1189, 1209–12 (5th Cir.1995), the Fifth Circuit Court of Appeals applied this exception to permit subsequent conspiracy prosecutions where the initially charged conspiracy was more limited in scope than the subsequent one. Having reviewed the analysis and policy considerations underlying the *Tolliver* decision, the undersigned finds them equally applicable to this case. Here, the original indictment, and the drug conspiracy charged therein, pale in comparison to the fourth superseding indictment, and the conspiracies charged therein, in terms of both scope and participants. The facts known to the government at the time when the fourth superseding indictment was returned could not have been known sooner, since much of the government's investigative success has come from information received by successive waves of cooperating defendants.[16] Thus, the Court concludes that Count One of the fourth superseding indictment falls within the due diligence exception to the double jeopardy clause. Accordingly, the Court denies Alvarez's motion to dismiss Count One.[17]

### 4. Double jeopardy as to Counts Fifteen and Sixteen:

■ As previously noted, Alvarez did not raise the double jeopardy bar as to these counts even though the charges asserted in them are the same as those found in Counts VII and VIII of the original indictment. The government relies on *Ricketts v. Adamson*, 483 U.S. 1, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) for the proposition that Alvarez's material breach of the plea agreement constitutes a waiver of his double jeopardy rights not to be re-indicted.[18] In *Adamson*, the defendant, after

---

**15.** This exception was first articulated by the United States Supreme Court in *Brown v. Ohio*, 432 U.S. 161, 97 S.Ct. 2221, 2227 n. 7, 53 L.Ed.2d 187 (1977), for cases where the government is unable to proceed on a more serious charge at the outset because the additional facts necessary to sustain such a charge could not have been discovered despite the exercise of due diligence.

**16.** The facts adduced at numerous plea colloquies and sentencings conducted by the undersigned in the cases of many of Alvarez's

cooperating co-defendants amply support this conclusion.

**17.** As noted by the *Tolliver* court, any prejudice to the defendant resulting from the initial prosecution can be eliminated through proper application of the sentencing guidelines. *Tolliver*, 61 F.3d at 1211 n. 35.

**18.** Having determined that the "due diligence" exception applies to Count One, the Court need not address this argument as to that count.

having been charged with first-degree murder, reached an agreement with the state to plead guilty to second-degree murder and testify against two others. Adamson testified at the trial of two individuals, which resulted in their convictions. On appeal, however, the convictions were reversed and Adamson refused to testify at the retrial, claiming that he had already fulfilled his obligations.[19] The plea agreement provided that "should the defendant refuse to testify or should he at any time testify untruthfully then this entire agreement is null and void and the original charge will be automatically reinstated." *Adamson,* 483 U.S. at 4, 107 S.Ct. 2680. The agreement further provided that "in the event this agreement becomes null and void, then the parties shall be returned to the positions they were in before this agreement." *Id.* at 9, 107 S.Ct. 2680. Ultimately, Adamson did not testify and the state re-indicted him for first-degree murder. The United States Supreme Court upheld the re-indictment, concluding that Adamson, having voluntarily and intelligently entered into the agreement, had waived the defense of double jeopardy. *Id.* at 9–10, 107 S.Ct. 2680. No comparable waiver provision is found in Alvarez's plea agreement.[20]

Moreover, the defendant has not sought, and nothing in this record supports, voiding of the plea agreement in its entirety. Indeed, the defendant's convictions as to Count I and as to the tax related charge in Case No. 96–610, still stand.[21] Thus, this case is not like those presented by defendants who have successfully set aside their plea agreements or had their convictions reversed on appeal. In such cases, the parties are placed back in the position they were prior to entering into the plea agreement and double jeopardy does not bar reindictment as to counts dismissed pursuant to the plea agreement. See *United States v. Podde,* 105 F.3d 813, 817 (2d Cir.1997) ("The numerous cases that consider this issue hold with apparent unanimity that when the defendant repudiates the plea bargain, either by withdrawing the plea or by successfully challenging his conviction on appeal, there is no double jeopardy obstacle to restoring the relationship between defendant and state as it existed prior to the defunct bargain.") (citing *Fransaw v. Lynaugh,* 810 F.2d 518, 524–25 (5th Cir.1987)).[22]

Based on the foregoing analysis, the Court concludes that Alvarez has not waived the defense of double jeopardy, either explicitly or by operation of law, as to Counts Fifteen and Sixteen of the fourth superseding indictment. Therefore, the Court dismisses those counts.

### 5. The Section 2255 motions:

In these motions, Alvarez seeks an order compelling the government to file a

---

19. Alternatively, Adamson agreed to testify upon the state's compliance with certain additional conditions, including his release from custody after the retrial.

20. Although the agreement includes a double jeopardy waiver clause, that provision is directed only at the imposition of criminal charges vis-a-vis a civil or administrative forfeiture action. Such waivers have been rendered unnecessary by the United States Supreme Court's decision in *United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), holding that civil in rem forfeitures do not constitute punishment for purposes of the double jeopardy clause.

21. In his motions pursuant to Section 2255, Alvarez specifically notes that he is not seeking to vacate his convictions.

22. In *Reid v. United States,* 142 F.3d 435, 1998 WL 69832 (6th Cir.1998) (unpublished opinion), the Sixth Circuit applied these principles to uphold the re-indictment of offenses that had been dismissed pursuant to a plea agreement, after the defendant's conviction under 18 U.S.C. § 924(c) was vacated by the district court in light of *Bailey v. United States,* 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472. The Sixth Circuit stated, "When a petitioner obtains a reversal of a charge to which he pleaded guilty, all counts may be reinstated because any waiver by the government was only conditioned on the defendant's guilty plea, a plea that the defendant has in effect withdrawn." *Reid,* at *2 (citing *Hawk v. Berkemer,* 610 F.2d 445, 448 (6th Cir.1979)).

motion for reduction of sentence pursuant to Rule 35. Having found that the defendant breached the plea agreement, the Court has further found that the government is excused from further performance under the agreement, including the filing of a Rule 35 motion. Moreover, the Court has found that Assistant United States Attorney Russell Killinger acted in good faith in his dealings with the defendant. *Compare United States v. Ganz*, 806 F.Supp. 1567 (S.D.Fla.1992) (Highsmith, J.) (granting motion to enforce plea agreement, where prosecutor acted in bad faith). Thus, even absent a breach of the plea agreement, Alvarez is not entitled to the relief he seeks.[23]

### CONCLUSION

Based upon the foregoing considerations, it is

ORDERED AND ADJUDGED that Defendant Jacinto Alvarez's motion to dismiss the indictment is GRANTED only as to Counts Fifteen and Sixteen of the fourth superseding indictment. The motion is DENIED in all other respects. By separate orders, the Court denies the defendant's two motions to vacate pursuant to 28 U.S.C. § 2255, currently pending as Sealed Cases No. 98–41–CIV–HIGHSMITH and 98–42–CIV–HIGHSMITH.

---

**23.** In reviewing the motions pursuant to Section 2255 filed by Mary Catherine Bonner, the Court noted allusions to "the conflict of interest under which his counsel labored" and to the "ineffective assistance of that counsel." The Court finds nothing in the evidentiary record, including Bonner's testimony, to support any inference of conflict or ineffectiveness on the part of Alvarez's prior counsel, Jay Levine. In any event, the issues of adequate representation are irrelevant to the relief sought by Alvarez in his Section 2255 motions, which are, in effect, motions for specific performance of the plea agreement.